FILED

JUL 18 2013

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 11-56921-ASW |
| VICTOR TALOSIG DE LEON and IMELDA FAJARDO DE LEON, | Chapter 11 |
| Debtors. | |

**MEMORANDUM DECISION AND ORDER**

This matter comes before the Court on three motions filed by Debtors Victor Talosig De Leon and Imelda Fajardo De Leon (hereafter, "Debtors") under 11 U.S.C. § 506(a) and (d) and Fed. R. Bankr. P. 3012 asking the Court to determine the value of three different parcels of real property. In all three motions, Debtors have asked the Court to set property values which would have the effect of avoiding a $407,500.00 judgment lien held by Creditors Mann Kim and Hun Kim (hereafter, "Creditors"). Debtors are represented by attorney Marc Voisenat, and Creditors are represented by attorney Zachary Tyson.

The Court held an evidentiary hearing on all three motions. Having considered the evidence and arguments offered by the parties, and for the reasons which follow, the Court finds and

1  concludes that with respect to the three parcels of real property
2  at issue, Creditors' judgment lien is wholly unsecured.  As
3  explained more fully below, each property must be valued as a
4  single family residence rather than as a business because: (1) the
5  judgment lien does not attach to the businesses run by Debtors or
6  to the rents generated by the properties; (2) the properties are
7  zoned as single family residences, and no special zoning was
8  required for the Debtors' use of the properties as residential care
9  facilities; (3) any sale of the properties would not obligate the
10  residents currently living at the properties to remain living at
11  the properties after any sale, nor guarantee that the properties
12  could continue being used as residential care facilities; and
13  (4) there were no improvements or changes made to the properties
14  which adapted them to residential care facility use rather than
15  just ordinary single family homes.

16

17  **I. Issues Presented**

18      There are three parcels of real property at issue, all located
19  in California.  The first is located at 32463 Regents Blvd. in
20  Union City ("the Regents Property"), the second is located at 6185
21  Broadway Ave. in Newark ("the Broadway Property"), and the third is
22  located at 32295 Ithaca St. in Hayward ("the Ithaca Property").
23  Each of the properties is used as a residential care facility for
24  mentally disabled residents.  See Cal. Health & Safety Code
25  § 1502(a)(1).

26      Debtors assert that all three properties should be valued as
27  single family residences.  In the original motion papers, Debtors
28  argued that the Regents Property should be assigned a fair market

1  value of $455,000.00, that the Broadway Property should be assigned

2  a fair market value of $280,000.00, and that the Ithaca Property

3  should be assigned a fair market value of $260,000.00.  Debtors now

4  contend that the Court does not need to determine the actual values

5  of the properties but instead only needs to determine that the

6  value of each property is less than what is owed to the senior

7  lienholders.[1]  Debtors contend that if the Court agrees with

8  Debtors, then Creditors' judgment lien is completely unsecured and

9  can be stripped from all three properties.

10     Creditors argue that Debtors' proposed valuations fail to take

11  into account the actual use and income of each property, as well as

12  any improvements made to the properties.  Creditors assert that the

13  Regents Property and the Broadway Property should each be assigned

14  a value of at least $900,000.00,[2] and that the Ithaca Property

---

16  [1] As discussed _infra_, at the time of the evidentiary hearing,
    and excluding a lien in the amount of $105,790.98 held by the
17  Internal Revenue Service (hereafter, "the IRS"), the unpaid debt on
    the first mortgages for each of the properties was as follows:
18  $726,609.78 for the Regents Property, $732,791.38 for the Broadway
    Property, and $464,949.73 for the Ithaca Property.

20  [2] Creditors had some difficulty in settling upon a valuation
    for these two properties.  Creditors originally argued in response
    to Debtors' motions that the Regents Property and the Broadway
21  Property should each be assigned a value of $971,818.08.  In their
    first trial brief, Creditors argued that these two properties
22  should each be assigned a value of $1,025,000.00.  At trial,
    Creditors' expert opined that the likely current value of the
23  Regents Property is $1 million and that the likely current value of
    the Broadway Property is $963,200.00. Creditors now assert in their
24  Closing Trial Briefs that based upon their expert's appraisal,
    under an income approach, each property is worth $1 million, but
25  under a sales comparable approach, each property is worth
26  $900,000.00.

should be assigned a value of at least $750,000.00.[3]  Creditors state that if the properties are assigned these values, then Creditors' lien is partially secured and cannot be stripped from any of the three properties.

The primary task before this Court is to determine the appropriate method(s) of valuing the three properties, and then to determine what value to assign to each of the properties.  Only then can the Court determine whether Creditors' judgment lien is secured -- either in part or in whole -- by any of the properties.

## II. Findings of Fact

Debtors own the Regents Property, the Broadway Property, and the Ithaca Property.  At all three properties, Debtors operate board and care homes for mentally disabled residents.  However, each business is owned by DeLeon Enterprises, LLC, a company which was established by Debtors and their three children.

Each property offers six client beds.  The properties do not offer skilled nursing, and there are no nurses or doctors on site at any of the properties.  According to Ms. DeLeon, the Regents Property had six clients until recently, when the number of clients was reduced to five, the Broadway Property has had four clients since 1990, and the Ithaca Property had five clients until

---

[3] Creditors also had some difficulty in settling upon a valuation for the Ithaca Property.  Creditors originally argued in response to Debtors' motion that the Ithaca Property should be assigned a value of $728,862.97.  In their trial brief, Creditors argued that the Ithaca Property should be assigned a value of $775,000.00.  At trial, Creditors' expert opined that the likely current value of the Ithaca Property is $850.00.  Creditors now state in their Closing Trial Briefs that based upon their expert's appraisal, the Ithaca Property is worth $750,000.00 under an income approach and $900,000.00 under a sales comparable approach.

approximately one year ago, when the number of clients increased to six.

Ms. DeLeon testified that no conditional use permits were required to operate the facilities at any of the properties.[4] However, the parties stipulated that operation of a residential care facility requires a license. Ms. DeLeon clarified that a license from the state, through Community Care Licensing, is required and that the licenses are not transferable.

Debtors offered copies of the licenses for the three properties into evidence. The licenses were issued by the State of California, Department of Social Services, to operate and maintain adult residential care facilities. Each license clearly states on its face that the license is not transferable. Each license allows up to six client residents at each property.

Ms. DeLeon stated that the licensing process involves certain training before a person is qualified to operate the business, and the process could take from six months to an entire year. Ms. DeLeon also testified that even if a buyer obtained a license, the clients might not stay, although a certain amount of goodwill in the business might be transferred to the new owner. Ms. DeLeon

---

[4] Ms. DeLeon is correct. Under Cal. Health & Safety Code § 1566.3(e), "No conditional use permit, zoning variance, or other zoning clearance shall be required of a residential facility which serves six or fewer persons which is not required of a family dwelling of the same type in the same zone."
Both of the parties' experts assumed, incorrectly, that a conditional use permit was required. Debtors' expert assumed that such a permit would not be transferable; Creditors' expert assumed the opposite. Both experts agreed that the transferability of any use permit could affect the value of the property. However, since no use permit was necessary to operate the businesses, any testimony concerning transferability of the use permit is irrelevant.

1   talked about the need for the seller to overlap the buyer for a

2   period of about a year after the sale in order to allow for

3   continued operation of the residential care facility while the

4   buyer attempts to obtain a license.  In addition, this overlap is

5   important because it gives the residents an opportunity to become

6   used to the new operators of the facility.

7        Creditor Mann Kim confirmed that the sale of a residential

8   care business would not include the clients, and that it was up to

9   the clients to decide whether to remain at the property after the

10  sale.  Ms. Kim testified that she had approximately 18 years of

11  experience with residential care facilities, specifically as a

12  licensee, and that she had purchased such facilities with Ms.

13  DeLeon as her agent[5] during 1997 or 1998.  Ms. Kim sold two of the

14  facilities back to both Debtors a couple of years later.  Ms. Kim

15  stated that when a residential care facility is sold, the clients

16  might or might not stay in the facility, because the clients can

17  become very attached to the staff and might want to move if the

18  staff moves to another facility.

19       Ms. DeLeon explained the licensing process, stating that a

20  person cannot obtain a license to operate a care facility at a

21  particular property until the person owns or rents the property.[6]

22  Ms. DeLeon stated that when a residential care home is sold, as

23  part of the sale agreement, the existing licensee will usually stay

24

25       [5] Ms. DeLeon testified that she has been a real estate agent
     since 1987.

26       [6] Whether Debtors would be able to obtain a new license to
     operate a residential care facility at another location was
27   unclear.  Ms. DeLeon testified that one of Debtors' other care
     facilities was shut down when a fight between clients resulted in a
28   death, which could make it more difficult to obtain a new license.

on and operate the business. How the income from the business is allocated -- how much to the licensee or to the buyer -- depends upon the terms of the purchase agreement.

**Valuation of the Properties**

Each side presented expert testimony as to the value of the three properties. Debtors offered testimony from Michael Donohue, and Creditors offered testimony from Barry Klein.

Mr. Donohue is a State Certified Real Estate Appraiser who has performed residential appraisals for approximately 30 years, mostly within Alameda and Contra Costa Counties. According to Mr. Donohue, he prepares between 1,000 and 1,400 appraisals per year. Mr. Donohue is not a commercial appraiser, does not feel qualified to conduct commercial appraisals, and has no experience appraising residential care facilities as ongoing business entities. However, Mr. Donohue has an M.B.A. in real estate and has taken advanced appraisal courses.

By contrast, Mr. Klein is a Certified Commercial Investment Member of the National Association of Realtors. Mr. Klein is not an appraiser, but is instead a real estate broker and agent. Mr. Klein is both a certified commercial real estate broker and a certified residential real estate broker, and has valued hundreds of commercial and residential properties since 1984. Mr. Klein does not sell residential care facilities[7] and has described himself as a "multi-family guy" who sells a broad range of

---

[7] Interestingly, Ms. DeLeon has the experience which Mr. Klein lacks. Ms. DeLeon testified that in her capacity as a realtor, she sold six residential care facilities in the same manner as single family residences. According to Ms. DeLeon, those properties were appraised as residences.

properties including multi-family properties, land, restaurants, and warehouses.

**Mr. Donohue's Valuations**

Mr. Donohue testified to his appraisal method in both general and specific terms. As a general matter, Mr. Donohue starts each appraisal by defining the scope of the assignment, then by determining which approaches to determining the property's value are appropriate. Mr. Donohue then extracts market data for each approach and reconciles the data into a final value.

Mr. Donohue identified three possible approaches for valuing each property: the sales comparison approach, the cost approach, and the income approach. With the sales comparison approach, Mr. Donohue testified that he looks at sales listings, pending sales, and other market data. With the cost approach, Mr. Donohue stated that he considers the replacement cost of the property, depreciates the property to account for its age, and adds in the value of the land. With the income approach, Mr. Donohue testified that he considers the income which the property generates along with a rent multiplier.

With all three approaches, Mr. Donohue stated that he evaluates the highest and best legal use of the property. All three properties are zoned single-family residential, not commercial. When properties are zoned residential, then Mr. Donohue stated that he considers the value of the property as single family residences and does not get into conditional uses which might not stay with the property. Mr. Donohue testified that while there might be hundreds of buyers in the market who would be

1   interested in the properties as residences, it would be a very

2   small minority of people who would be interested, qualified, and

3   licensed to run residential care facilities at each property.

4       For the Broadway Property, Mr. Donohue preferred a sales

5   comparison approach. As of January 24, 2012, Mr. Donohue concluded

6   that under a sales comparison approach, the Broadway Property had a

7   value of $365,000.00. Using the same approach, Mr. Donohue

8   concluded that as of December 14, 2012, the Broadway Property had a

9   value of $442,500.00.

10      Using an income approach, Mr. Donohue used the rent that the

11  property could obtain if rented as a single family residence, but

12  did not consider the business income that the property actually

13  generates. Mr. Donohue then concluded that under an income

14  approach, the Broadway Property had a value of $269,850.00 as of

15  January 24, 2012.

16      Mr. Donohue did not prefer the cost approach, because the cost

17  approach is not easy to use in a suburban, built-up environment,

18  and because the depreciation is hard to estimate. Mr. Donohue only

19  used the cost approach after the approach was mentioned by the

20  Court at a prior hearing, and concluded that under the cost

21  approach, the Broadway Property would have had a value of

22  $338,401.00 as of January 24, 2012.

23      For the Ithaca Property, Mr. Donohue concluded that using a

24  sales comparison approach, the property had a value of $250,000.00

25  as of January 24, 2012, and a value of $269,000.00 as of December

26  14, 2012. Under an income approach, Mr. Donohue gave the property

27  a value of $224,250.00 as of January 24, 2012. Using a cost

28  approach, Mr. Donohue gave the property a value of $262,762.00 as

1 | of January 24, 2012, and did not believe that the value of the
2 | property would exceed $500,000.00 under a cost approach at the time
3 | of his testimony.

4 |     For the Regents Property, using a sales comparison approach,
5 | Mr. Donohue gave the property a value of $470,000.00 as of January
6 | 24, 2012, and a value of $615,000.00 as of December 14, 2012.
7 | Under the income approach, Mr. Donohue gave the Regents Property a
8 | value of $371,200.00 as of January 24, 2012.  Using a cost
9 | approach, Mr. Donohue valued the property at $456,400.00 in January
10 | 24, 2012.

11 |     Mr. Donohue testified that it would not be appropriate to
12 | value the properties as businesses, using an income approach, for
13 | several reasons.  First, Debtors could relocate the care facility
14 | to another house, and the current residents could leave.  Second,
15 | there were no significant structural changes to any of the
16 | properties which would make the properties inherently care
17 | facilities as opposed to single family residences.  The only
18 | structural change was to the Ithaca Property, for which the garage
19 | had been converted to residential space, but such conversion
20 | enhanced the property's value as a residence and Mr. Donohue
21 | considered the conversion in assigning value.  Third, Mr. Donohue
22 | testified that it would not be proper to combine severable assets
23 | -- the business and the underlying real estate -- into a single
24 | assessment, particularly since the business was an intangible asset
25 | which could disappear.  Mr. Donohue explained that the Uniform
26 | Standards applicable to appraisals treat appraisals of real
27 | property differently from appraisals of businesses.  Finally, Mr.
28 | Donohue explained that as a matter of financing, a mortgage company

or bank would not provide financing for a single family residence and a business within a single department. Instead, if a lender agreed to lend money beyond the value of the real estate, the lender would finance the purchase only if the lender also took a lien on the business. (As noted above, Creditors here do not have a lien on the businesses or on the rents.)

### Mr. Klein's Valuations[8]

Mr. Klein took a different approach to valuing the three properties than did Mr. Donohue. Mr. Klein testified that there is a major difference between valuing income property and valuing property for residential use, and that valuing commercial property involves an entirely different methodology. However, Mr. Klein then identified three approaches to valuing commercial property which are not all that different from the three approaches identified by Mr. Donohue: the income method, the sales comparables method, and the replacement cost method. Mr. Klein simply applied these approaches in a different way.

Mr. Klein explained that when residential property is used to generate income, it is a "gray area" as to which method should be

---

[8] The valuations offered by Mr. Klein are more specific than the statement of value in Creditors' proof of claim. According to the proof of claim, Creditors' lien is against "all of Debtors' property located in Alameda County," and such property has a value of $3,015,000.00. However, unlike Mr. Klein, the proof of claim offers no specific values for each of the three properties at issue.

Oddly, Mr. Klein's appraisal -- about which Mr. Klein testified at great length and which was included in Creditors' exhibit book as Exhibit 1 -- was never admitted into evidence during the trial. This appears to have been the result of oversight, and given the near redundancy of Mr. Klein's testimony and the contents of Mr. Klein's appraisal, the Court treats Exhibit 1 as having been admitted.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  used, but that the property should be valued based on its use,
2  which in turn is determined by zoning.  In any event, Mr. Klein
3  opined that the income and sales comparables methods were the two
4  best methods for valuing the properties.  Mr. Klein then opined
5  that board and care facilities should be valued as commercial
6  properties, and that commercial brokers would treat board and care
7  facilities like assisted living facilities, rather than as skilling
8  nursing -- or congregate care -- facilities.[9]

9       In support of the opinion that residential care facilities are
10 valued as commercial properties, Mr. Klein referred to the website
11 Loopnet.com ("Loopnet"), which is used to advertise available
12 commercial properties.  Mr. Klein then pointed to several listings
13 for assisted living residences on Loopnet located in different
14 parts of California, including Mission Viejo and San Diego.  All of
15 the Loopnet properties were listed as "senior housing," although
16 Mr. Klein opined that not all of the properties would necessarily
17 be senior housing.  However, Mr. Klein did not point to any
18 specific Loopnet listing that was anything other than senior
19 housing.  He also did not point to any listing that was for a
20 property being used as a residential care facility.

21      In valuing the residential care facilities, Mr. Klein
22 preferred the income approach, because the approach is a better
23 indicator of value when there is a sale of both real estate and the
24 business located on the real estate.  With this approach, for each
25 property, Mr. Klein took the monthly net operating income of the
26 property, multiplied it by 12, then divided it by a capitalization

27
28      [9] As noted above, these three properties are in areas zoned
   residential, not commercial.

rate of 10%.[10]  To calculate the net operating income, Mr. Klein subtracted operating expenses from gross income.  However, Mr. Klein explained that net operating income is revenue after expenses (such as insurance, repairs, maintenance, salaries, and utilities) but before debt service.  According to Mr. Klein, this is a typical approach for determining the net operating income for income-producing property.  In this analysis, Mr. Klein assumed the gross rental income was $2,004 per bed, a figure provided to him by Ms. DeLeon.

However, Mr. Klein acknowledged that the calculation of net operating income could be imprecise, that Mr. Klein lacked access to the books and records he would otherwise need for a precise calculation, and that the owner's passive or active involvement in running the business was relevant to the calculation.  Mr. Klein did not know whether Debtors' salaries for operating the facilities were expensed prior to the calculation, or the degree of Debtors' involvement in providing services to clients.

Mr. Klein selected a 10% capitalization rate because that rate occurred frequently for sold comparable properties on various websites, where Mr. Klein saw capitalization rates ranging from 3% to 25%.[11]  Mr. Klein testified that he used several different sources to obtain comparables, including Online Health Network, Co-Star, and Loopnet.

---

[10] However, Mr. Klein agreed that when a single family residence is rented out as a residence, Mr. Klein would not use a capitalization rate at all.

[11] A lower capitalization rate corresponds with a higher value, and vice versa.

For both the Broadway Property and the Regents Property, Mr. Klein assumed a pre-debt, yearly net operating income of $100,000.00, which divided by 10% yielded an overall property value of $1,000,000.00. For the Ithaca Property, Mr. Klein assumed a pre-debt, yearly net operating income of $75,000.00, which divided by 10% resulted in a property value of $750,000.00.[12]

However, the expenses which Mr. Klein deducted to calculate net operating income were, by Mr. Klein's admission, "slim" and did not look to be correct. Mr. Klein assumed expenses of $44,000.00 per year for the Broadway Property, but Mr. Klein did not believe that was realistic and wanted to know why he was given numbers which did not make sense. Mr. Klein then testified that the valuations of the three properties which he prepared using the income approach may be open to question, because if the expenses were incorrect, it would be "garbage in, garbage out."[13]

Mr. Klein also considered comparable sales and concluded that each of the three properties would be worth $900,000.00 under a comparable sales analysis. In this analysis, Mr. Klein compared

---

[12] The significance of Mr. Klein's selection of a 10% capitalization rate cannot be understated. If Mr. Klein had selected a 13% rate -- which in his testimony fell within the range of what he typically saw -- then using Mr. Klein's methodology, he would have valued the Broadway Property and the Regents Property at $769,231.00 ($100,000.00 ÷ 0.13), and the Ithaca Property at $576,923.00 ($75,000.00 ÷ 0.13). If Mr. Klein had selected a 25% rate, the values would have been $400,000.00 ($100,000.00 ÷ 0.25) for the Broadway Property and the Regents Property, and $300,000.00 ($75,000.00 ÷ 0.25) for the Ithaca Property.

[13] The Debtors' Chapter 11 Statement of Current Monthly Income listed no expenses for any of the three properties. Mr. Klein testified that the absence of any listed expenses was likely the result of Debtors having made a mistake in completing the form, and that this could have led to Mr. Klein's reliance on incorrect data in preparing his valuations.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  attributes of the Debtors' properties with attributes of other,
2  sold properties used as care facilities. Mr. Klein used the same
3  comparables when valuing all three of Debtors' properties. The
4  attributes Mr. Klein considered included income streams, vacancy
5  rates, location, square footage, and parcel size, among other
6  things. The Regents Property is 2,660 square feet, the Broadway
7  Property is 1,544 square feet, and the Ithaca Property is 1,643
8  square feet.

9      In Mr. Klein's opinion, the best example of a comparable
10  property to all three of Debtors' properties was 725 Las Barancas
11  Drive in Danville, California, which sold for $900,000.00 in 2011
12  at a capitalization rate of 6.7%. The Las Barancas Property was a
13  1,998 square foot property on a .44 acre lot with seven bedrooms
14  and three baths. Mr. Klein originally testified that he did not
15  know how many beds the Las Barancas Property could support, but
16  later testified that there were six beds. Mr. Klein also did not
17  originally know what income was derived by the Las Barancas
18  Property. Mr. Klein later testified that the annual net operating
19  income for the Las Barancas Property was $60,000.00. Mr. Klein did
20  not know whether there were doctors or nurses on the premises. Mr.
21  Klein agreed that the location of the Las Barancas Property was
22  superior to the location of the Broadway Property and therefore the
23  Las Barancas Property would be more valuable.

24      On the first day of his testimony, Mr. Klein opined that the
25  next closest example of a comparable sale to all three of Debtors'
26  properties would be 4500 Santee in Fremont, California, a 3,200
27  square foot property on a .13 acre lot which sold for $830,000.00
28  in 2008. Again, Mr. Klein did not know the income derived from the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Santee Property, the number of clients who lived there, or whether there were doctors or nurses on the premises. In addition, the Santee property is much larger than any of the three properties at issue, here.

On the second day of his testimony, Mr. Klein testified that there was a better example of a property comparable to Debtors' properties located at 2492 Aram Avenue in San Jose, California, a 1,782 square foot property with six beds which sold for $960,000.00 in 2007 at a capitalization rate of 16%. According to Mr. Klein, the Aram Property had an annual net operating income of $160,000.00, and also provided skilled nursing care.

Consistent with Mr. Donohue, Mr. Klein did not believe that replacement cost was a good means of valuing the properties.[14] However, in Mr. Klein's opinion, under a replacement cost analysis, the Broadway Property should be valued at $963,200.00, consisting of a replacement cost at $300 per square foot of $463,200.00, a land value of $150,000.00, and a business value of $360,360.00. Under the same analysis, Mr. Klein opined that the Regents Property should be valued at $1,298,000.00, which consisted of a replacement cost of $798,000.00, a land value of $150,000.00, and a business value of $360,360.00. Finally, under a replacement cost approach, Mr. Klein opined that the Ithaca Property should be valued at $855,400.00, which consisted of a replacement cost of $492,900.00, a land value of $100,000.00, and a business value of $262,500.00.

Mr. Klein also testified as to the "most likely current market value" of each property. These were $963,200.00 for the Broadway

---

[14] The Court agrees with both appraisers that the replacement cost method is not the best way to value the properties at issue here.

Property (which inexplicably reflected the valuation under what he characterizes as the less desirable replacement cost analysis), $1,000,000.00 for the Regents Property (which reflected the value under an income analysis), and $850,000.00 for the Ithaca Property (which was a result not yielded by any of the three methods set forth in Mr. Klein's appraisal). Mr. Klein did not explain what method or methods he used to obtain these valuations.

### Liens on the Property

Creditors have a judgment lien in the amount of $494,023.97 on all three properties.[15] However, for each of the three properties, there are senior lienholders. According to Ms. DeLeon, the IRS holds a lien in the approximate amount of $105,790.98, which has been recorded against all three properties. Excluding the IRS's lien, counsel for Debtors stated that at the time of the trial, the unpaid debt on the first mortgage was $726,609.78 for the Regents Property, $732,791.38 for the Broadway Property, and $464,949.73 for the Ithaca Property. These debt amounts are also documented in the proofs of claims filed by the IRS, JP Morgan Chase Bank and Ocwen Loan Servicing.[16] Creditors did not challenge any of these numbers.

---

[15] Ms. Kim's testimony explained how the lien came to exist, but the underpinnings of the lien are not relevant to this Court's analysis, because the validity of the lien is not disputed in this case.

[16] Debtors' bankruptcy schedules filed August 8, 2011, show different debt amounts. According to Schedule D, Debtors owed Chase Home Finance a balance of $579,852.70 for the Broadway Property, owed Chase Home Finance $805,000.00 for the Regents Property, and owed Ocwen Loan Servicing $458,803.31 for the Ithaca Property. Schedule D also listed debts to the IRS of $86,000.00 and to Creditors of $397,000.00

## III. Conclusions of Law

Debtors have asked the Court to assign values to the Regents Property, the Broadway Property, and the Ithaca Property in accordance with 11 U.S.C. § 506(a)(1). This statute provides:

> **An allowed claim of a creditor secured by a lien on property in which the estate has an interest,** or that is subject to setoff under section 553 of this title, **is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property,** or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. **Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.**

(Emphasis added). Initially, Debtors bear the burden of overcoming any presumption that the values of the properties stated in Creditors' proof of claim are indeed the correct values. See In re Postolica, No. 10-51522-ASW, 2012 WL 1035900 *5 (Bankr. Mar. 27, 2012) (citing In re Southmark Storage Associates Ltd. Partnership, 130 B.R. 9, 10 (Bankr. D. Conn. 1991)). Once Debtors meet this burden, it then becomes Creditors' burden of persuasion to demonstrate the value of the collateral by a preponderance of the evidence. Id.

Here, Creditors' proof of claim does not state precise values for the three properties and instead states that the total value of all of Debtors' properties located in Alameda County -- without differentiation -- is $3,015,000.00. Debtors have presented evidence demonstrating that the properties, if valued as single family residences, have much lower values than what Creditors now

Case: 11-56921    Doc# 203    Filed: 07/18/13    Entered: 07/19/13 11:52:20    Page 18 of 31

1  assert.  Therefore, Debtors have met their burden of overcoming any

2  presumption that the proof of claim states the correct valuation of

3  the properties.  Consequently, it is Creditors' burden to persuade

4  the Court that the properties should be given a higher value than

5  what Debtors contend.

6       The parties have cited, and the Court has found, no cases

7  addressing the valuation of a residential care facility under

8  § 506(a).  However, both sides have cited <u>Associates Commercial</u>

9  <u>Corp. v. Rash</u>, 520 U.S. 953 (1997), in support of their respective

10 positions concerning the method of valuation.  In <u>Rash</u>, the Supreme

11 Court considered a Chapter 13 "cram down" in which the debtors

12 proposed to use the security -- a truck -- as part of the debtors'

13 repayment plan and in order to generate an income stream.  In such

14 a case, the Supreme Court rejected a foreclosure value standard,

15 because no foreclosure sale would take place, and instead held that

16 the value of the property was "the price a willing buyer in the

17 debtor's trade, business, or situation would pay to obtain like

18 property from a willing seller."  <u>Id.</u> at 960.  The Supreme Court

19 later explained that when making a valuation determination under

20 § 506(a), "the 'proposed disposition or use' of the collateral is

21 of paramount importance[,]" not "various dispositions or uses that

22 might have been proposed."  <u>Id.</u> at 962, 964.  However, the Supreme

23 Court made it clear that before a bankruptcy court even makes a

24 determination of value, the bankruptcy court must assess what

25 interest the creditor has in the estate's interest in the property.

26 <u>Id.</u> at 961.  This comports with the plain language of § 506(a),

27 which clearly states that the creditor's lien is secured "to the

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

extent of the value of such creditor's interest in the estate's interest in such property."[17]

The Ninth Circuit's decision in In re Kim, 130 F.3d 863 (9th Cir. 1997), decided shortly after Rash and also a Chapter 13 case, is instructive. Citing Taffi v. United States (In re Taffi), 96 F.3d 1190 (9th Cir. 1996), the appellate court in Kim explained that when a debtor retains property subject to a lien, the proper valuation of the property is fair market value, not foreclosure value. Kim, 130 F.3d at 865. In the context of Kim -- in which the creditors held security interests in the lease of the business and in the business' equipment -- the fair market value of equipment used in a business needed to be based upon the use of the equipment as part of a going concern, not based upon what the equipment would sell for if the equipment were removed from the business and liquidated. Id. Similarly, in Taffi, a Chapter 11 case, the correct valuation was the higher, fair market value of the debtors' personal residence, rather than a lower foreclosure value. Taffi, 96 F.3d at 1192 (defining fair market value as "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time").[18]

The Ninth Circuit's application of § 506(a) is consistent with what other courts have done. For instance, in In re Heritage

---

[17] Although Rash was a Chapter 13 case, the Sixth Circuit Bankruptcy Appellate Panel in In re Creekside Sr. Apartments, LP, 477 B.R. 40, 55 (B.A.P. 6th Cir. 2012), observed that the valuation method in Rash is equally applicable to Chapter 11 cases.

[18] In Rash, 520 U.S. at 959 n.2, the Supreme Court noted that the definition of fair market value in Taffi was consistent with the Supreme Court's method for determining value.

1   <u>Highgate, Inc.</u>, 679 F.3d 132, 141 (3d Cir. 2012), the Third Circuit
2   Court of Appeals explained that selection of an appropriate method
3   of valuation was a function of the bankruptcy court, and that a
4   bankruptcy court should "choose the standard that best fits the
5   circumstances of a particular case." (Citing  H.R.Rep. No. 95-595,
6   at 356 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6311).  The
7   appropriate method would depend upon both the nature of the
8   creditor's interest in the property at issue and what was to be
9   done with the property.  <u>Id.</u>  The valuation should also take into
10  account unique aspects of the property which a buyer might find
11  attractive.  <u>See</u> <u>In re Lewis and Clark Apartments, LP</u>, 479 B.R. 47,
12  53 (B.A.P. 8th Cir. 2012) (an analysis of a property's fair market
13  value under <u>Rash</u> should take into account any tax credits which
14  accrue to the owner of the property, because the existence of the
15  tax credits have an impact on what a buyer would be willing to pay
16  for the property).

17

18      **A. The Purpose of the Valuation**

19      The purpose of the valuation in this case is to determine
20  whether Creditors' judgment lien is secured, to any extent, by any
21  of the three properties.

22

23      **B. The Extent of Creditors' Interest in the Estate's Interest**

24      Under § 506(a)(1), the Court must consider the nature and
25  scope of Creditors' "interest in the estate's interest" in the
26  three properties at issue.  <u>See</u> <u>Rash</u>, 520 U.S. at 961.  Creditors'
27  lien can only be treated as secured to the extent that Creditors
28  have a legal interest in the estate's interest.  The estate's

interest, here, consists of ownership of each parcel of property. However, the business operated on each property is owned by DeLeon Enterprises, LLC, which is a company Debtors established and in which Debtors have an interest. The company, itself, is not in bankruptcy.

The Creditors' interest in this case is a judgment lien. The lien arises under California state law. By statute, the lien can attach to real property, "but does not reach rental payments, a leasehold estate with an unexpired term of less than two years, the interest of a beneficiary under a trust, or real property that is subject to an attachment lien in favor of the creditor and was transferred before judgment." Cal. Civ. Pro. § 697.340(a).

Accordingly, Creditors' judgment lien reaches the real properties, but not the rents paid by residents of the properties. Because Creditors have no legal interest in the rents generated by the businesses on each property, Creditors' lien is not secured by the businesses or the income stream generated by those businesses.

The separate nature of the real properties and the businesses conducted on them was addressed by Mr. Donohue, and in this respect the Court finds Mr. Donohue's testimony persuasive. The value attributable to the real estate -- *i.e.*, the value of the single family residence -- is separate from any value attributable to the business conducted thereon or any income stream, which can be valued and sold separately.[19] The fact that a single buyer might purchase both the real property and the business in a single

---

[19] The replacement cost analyses conducted by Mr. Klein -- in which separate values were attributed to the businesses -- also demonstrate the separateness of the businesses from the real properties.

transaction does not affect the separate nature of either.[20]

### C. The Proposed Disposition or Use of the Properties

The current use of the properties as residential care facilities is also Debtors' proposed use during the reorganization. According to Rash, 520 U.S. at 962, 964, this proposed use is of paramount importance to this Court's determination of the properties' fair market value.

Creditors have urged the Court to consider the highest and best use of the properties. Debtors' appraiser, Mr. Donohue, also testified that the technique in appraising is to determine the highest and best use of the property based upon the property's zoning and legal use. Neither Debtors nor Creditors have explained whether the "highest and best use" is the correct test, particularly in light of the plain language of § 506(a) and the Supreme Court's decision in Rash requiring this Court to consider the actual, proposed use. If Debtors were using the properties for a substantially below market use, then it might be inappropriate to consider a valuation based upon the highest and best use. However, neither side has contended that there is a higher or better use for the properties than use as residential care facilities.

Debtors appear to have argued that the Court should disregard the proposed use of the properties in the valuation analysis

---

[20] The Court could envision a circumstance in which real property is sold to a passive investor, and the business is sold to a separate party who intends to lease the premises for purposes of conducting a business. The parties did not mention such a scenario during the hearing, although both Ms. DeLeon and Ms. Kim touched on the possibilty that the real property could be sold and the licensee could lease back the property and continue to operate the business.

1 because if the properties were sold, the properties could not be

2 used as residential care facilities immediately after the sale.

3 While the Court is required to consider Debtors' intention to

4 continue using the properties as residential care facilities, the

5 Court concludes that such intention has little, if any, influence

6 on the properties' fair market value. The Court can conceive that

7 some buyers may have the ability to use the properties in the same

8 manner as the Debtors and that the existence of such potential

9 buyers may influence the properties' fair market value. However,

10 there is absolutely nothing special about these three houses --

11 they have not been fitted for use as residential care facilities,

12 and the conversion of the garage at the Ithaca property enhanced

13 its value as a residence.[21] Therefore, a potential buyer who may be

14 interested in establishing a residential care facility could

15 purchase hundreds, if not thousands, of other houses as well.

16 Also, as discussed above, the Creditors here have no lien on

17 Debtors' business(es) in any event.

18     It is also speculative to suggest that the properties' current

19 use as residential care facilities would add value to a prospective

20 buyer. The fact that Debtors use these particular houses to

21 operate residential care facilities does not mean that a buyer of

22 one or more of these houses could do the same. Indeed, Ms. DeLeon

23 testified that if she had wanted to sell one or more of these

24 properties as residential care facilities, she would expect to

25 overlap with the buyer for a year to encourage the existing tenants

26

27     [21] If the properties had been remodeled or improved to make them more suitable for use as residential care facilities, such alterations might have had a positive -- or possibly even a

28 negative -- effect on the properties' value.

to remain with the new owners.  In such circumstance, there is a
risk that the buyer could be unsuccessful in obtaining a license to
operate a residential care facility.  Also, if a seller is
unwilling to remain and to operate the business, any potential
value for a property's continued use as a residential care facility
dissipates.  Therefore, the fact that the Debtors' properties are
presently used as residential care facilities adds little, if any,
value under the facts of this case, particularly given Creditors'
lack of a legal interest in the rents.

### D. The Appropriate Method of Valuation

Because Creditors' lien does not reach the business proceeds,
the Court must assign the properties a value which is separate from
the businesses which are operated on the properties.  This does not
mean that the Court should disregard the impact the businesses have
on the properties' values.  Simply, the Court cannot value the
properties as inclusive of the businesses.  This is appropriate,
also, because in a real-world sale of the properties, the
businesses might not continue to exist after any sale, for the
reasons discussed earlier.

Creditors contend that the Court should use an income approach
in valuing the properties.  Under this approach, the Court would
take the net operating income for each property and divide that
figure by a capitalization rate.  However, the Court concludes that
such a method is inappropriate.  The income approach gives too much
weight to the income generated by the properties, and Creditors
have no legal interest in that income.  In addition, the
uncontroverted testimony at the hearing shows that Debtors made no

improvements to the properties which are unique to residential care
facilities, and the properties remain habitable as single family
residences.  If the properties were placed on the market for sale,
it would not be possible for a buyer to purchase the properties and
operate a residential care facility without obtaining a license,
which could take considerable time, or without making a contractual
arrangement with the existing licensee to remain at the property to
operate the business.  In other words, the potential universe of
buyers for such properties would appear to consist mainly of people
who would occupy the properties as primary residences.

However, this Court must approach the fair market value
determination from the perspective of a willing buyer in Debtors'
trade, business, or situation.  <u>See</u> <u>Rash</u>, 520 U.S. at 960.  The
fact that the properties have been used as residential care
facilities demonstrates the properties' potential for similar usage
in the future.  This potential may have some negligible value in
addition to the value each property would have if a buyer were
looking for a single family residence, although any similar house
-- of which there could be hundreds or thousands -- might have the
same potential.  However, there is no evidence of what this value
should be, and from Ms. DeLeon's testimony, the value of the
goodwill -- which is really more a business asset than part of the
real estate -- is dependent upon the contractual terms agreed to by
a seller and buyer in each particular transaction.  Also, any such
additional value would, in all likelihood, be offset by the
potential risks the buyer faces of not obtaining a license to
operate the facility and being left with an ordinary residence.
Therefore, the Court concludes that the valuation of the properties

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Case: 11-56921   Doc# 203   Filed: 07/18/13   Entered: 07/19/13 11:52:20   Page 26 of
31

26

1 as single family homes is the closest approximation of the real
2 properties' actual value.

3     This is not to suggest that there is no market for the sale of
4 residential care facilities as ongoing businesses. Mr. Donohue
5 testified that while such a market exists, it would be very small.
6 Also, there is some risk to a buyer in that market. Ms. DeLeon
7 explained that a buyer who purchases the property might not obtain
8 a license, but if a license is eventually obtained, then the buyer
9 might obtain the benefit of retaining some of the existing clients.
10 In a cooperative sale, the seller will want to help the buyer
11 succeed in retaining the clients, so there is a good potential for
12 the buyer to make money from the business at some point in the
13 future. Because of the risk of not obtaining a license or keeping
14 the clients, the value of the property should be the fair market
15 value of the real estate as a residence.

16     Creditors have cited <u>Flash Island, Inc. v. Whispering Pines</u>
17 <u>Estate, Inc. (In re Whispering Pines Estate, Inc.)</u>, No. 05-56003-
18 MWV, 2007 WL 4498993 (Bankr. D. N.H. Dec. 24, 2007), in support of
19 valuing the properties as going business concerns. However, the
20 decision in <u>In re Whispering Pines Estate, Inc.</u> -- which is
21 unreported -- contains no analysis as to why the 16-bed residential
22 care facility property was valued as a going concern, or why the
23 bankruptcy court adopted the methodology of the appraiser, whose
24 testimony was uncontroverted. As discussed below, in California,
25 residential care facilities with six or fewer beds are treated as
26 single family residences for zoning purposes. Therefore, the
27 facility in <u>In re Whispering Pines Estate, Inc.</u>, likely would not
28 have been zoned as a single family residence if it had been located

1   in California rather than in New Hampshire.  In addition, the

2   creditor in <u>In re Whispering Pines Estate, Inc.</u>, was not a judgment

3   lienholder and may well have held a security interest in any cash

4   collateral generated by the property.

5       Creditors have also cited the Supreme Court's decision in

6   <u>Consolidated Rock Products Co. v. Du Bois</u>, 312 U.S. 510 (1941), in

7   support of valuing the properties as going concerns.  It is true

8   that in <u>Consolidated Rock Products</u> -- which addressed fairness of a

9   proposed reorganization plan under § 77B of the Bankruptcy Act --

10   the Supreme Court concluded that the expectation of income from a

11   commercial property should be considered in determining the

12   commercial value of the property.  312 U.S. at 526.  However, the

13   Supreme Court was not confronted with a circumstance in which the

14   creditor's lien was statutorily limited to the real property and

15   did not attach to business proceeds.

16       Valuing the three properties as single family homes is also

17   congruent with California public policy.  The California

18   legislature has made it plain that residential care facilities

19   housing six or fewer residents are to be treated as single family

20   residences for zoning purposes.  Cal. Welf. & Inst. Code § 5116.

21   The reason for such treatment is to further the public policy of

22   providing group homes for disabled persons to allow such persons to

23   "realize their full potential."  <u>See</u> <u>McCaffrey v. Preston</u>, 154 Cal.

24   App. 3d 422, 432 (1984).  Treating smaller residential care

25   facilities as residences, for zoning purposes, makes it easier for

26   people to establish new residential care facilities in any house in

27   any residential neighborhood.  The business which ultimately

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  flourishes on the property is distinct, and has separate value,
2  from the underlying real estate.

3      Accordingly, given the limited extent of Creditors' legal
4  interest in the estate, the Court rejects both the income method of
5  valuing the properties as giving undue weight to the rents
6  generated by the properties, as well as the replacement cost
7  analysis which neither expert preferred.  This leaves a sales
8  comparison approach to valuation.

9      The sales comparison approach used by Mr. Klein involved a
10  comparison with other care facilities and emphasized the income
11  streams generated by those facilities.  By contrast, Mr. Donohue
12  used different market comparables.

13      The Court finds Mr. Donohue's approach to be the better
14  approach for determining the properties' fair market value.  For
15  all practical purposes, the properties are single family homes.
16  The properties have not been modified in any particular way which
17  makes the properties uniquely residential care facilities as
18  opposed to single family residences.  Not only are the properties
19  zoned single family, but anyone who wants to open a new residential
20  care facility with six or fewer beds can buy any single family
21  property for that purpose.

22      If the Court adopts the higher of Mr. Donohue's values, then
23  the Regents Property has a value of $615,000.00, the Broadway
24  Property has a value of $442,500.00, and the Ithaca Property has a
25  value of $269,000.00.  These values are substantially less than
26  what Debtors owe on the first mortgage for each property,
27  specifically, $726,609.78 for the Regents Property, $732,791.38 for
28  the Broadway Property, and $464,949.73 for the Ithaca Property.

1  Therefore, Creditors' judgment lien is completely unsecured and can

2  be stripped from all three of these properties.

3  **IT IS SO ORDERED.**

4

5  Dated:

6           July 18, 2013                    _____

7                                            ARTHUR S. WEISSBRODT
                                             UNITED STATES BANKRUPTCY JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

2   Victor Talosig De Leon
      Imelda Fajardo De Leon
3   1350 Country Club Drive
      Milpitas, CA 95035
4

5   Marc Voisenat
      Law Offices of Marc Voisenat
      1330 Broadway #734
6   Oakland, CA 94612

7   Zachary Tyson
      Nova Law Group
8   800 West El Camino Real #180
      Mountain View, CA 94040
9

10   Mann S. Kim
      Hun M. Kim
      236 E. Lowell Ave
11   Tracy, CA 95376

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28