

**IT IS SO ORDERED.**
**Signed June 30, 2014**

*Arthur S. Weissbrodt*

**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                          ] Case No. 11-56921-ASW
                                               ]
                                               ]
VICTOR TALOSIG DE LEON and                     ]
IMELDA FAJARDO DE LEON,                         ] Chapter 11
                                               ]
            Debtors.                            ] Trial Date: February 24, 2014
                                               ]
_____]

### MEMORANDUM DECISION AND ORDER ON MOTION TO VALUE LIEN

The Debtors, Victor Talosig De Leon and Imelda Fajardo De Leon ("the Debtors"), filed a motion asking this Court to determine the value of their residence located at 1350 Country Club Drive in Milpitas, California ("the Property"). The purpose of the motion is to avoid a junior mechanic's lien in the amount of $25,350 held by JP Paving and Grading ("the Creditor"). At a trial held on February 24, 2014, the Debtors were represented by attorney Marc Voisenat, and the Creditor was represented by David Siegel.

The Debtors contend that the value of the Property is less than the amount owed to the holder of the first deed of trust, JP Morgan Chase ("the Bank"). The parties do not dispute that the Bank's lien is in the amount of $2,253,668.32. However, the

parties disagree as to whether the Property is worth more than that amount.

In this regard, both parties have offered testimony and competing appraisals from licensed appraisers. Appraiser Mark Ivie testified on behalf of the Creditor and opined that the Property has a value of $2,750,000, which is approximately $500,000 over the amount owed to the Bank. Appraiser Patrick McElroy testified on behalf of the Debtors and opined that the Property has a value of $2,050,000, which is roughly $200,000 less than what is owed to the Bank. Exhibits 1, 2, 3, B, C, and D were offered and admitted as evidence.

For the reasons which follow, the Court finds the Creditor's evidence of value more persuasive than the Debtors' evidence, and concludes that the Property's value is greater than the amount owed to the Bank. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. Findings of Fact

The Debtors filed their bankruptcy petition under chapter 11 on July 25, 2011. The Creditor filed a proof of claim on November 15, 2011, and an amended proof of claim on December 9, 2011. The Creditor's claim is in the amount of $25,350, and is a mechanic's lien for asphalt and concrete work, secured by the Property. Neither the proof of claim nor the amended proof of claim states the value of the Property. The mechanic's lien is junior to the first deed of trust held by the Bank in the amount of $2,253,668.32, as stated in the Bank's proof of claim.

**A. Testimony and Appraisal of Mark Ivie**

The Creditor retained Mark Ivie to appraise the Property. Mr. Ivie is a certified residential real estate appraiser who works in Santa Clara County at Mark Ivie Appraisal Services. Mr. Ivie has worked for more than 30 years in the appraisal business, and has performed approximately 20 appraisals per month during that time. Mr. Ivie estimated that Mr. Ivie has done more than 6,000 appraisals during his career, and that he has testified in court up to 30 different times.

According to Mr. Ivie, Mr. Ivie appraises residences and small income-producing properties. However, most of Mr. Ivie's appraisals are of single-family residences.

Mr. Ivie conducted an appraisal of the Property. Mr. Ivie's appraisal of the Property was an exterior-only appraisal. Mr. Ivie did not request access to the interior of the Property. Instead, Mr. Ivie visited the Property on November 21, 2013, drove to the foot of the Property's driveway, examined public information about the Property, looked at Google maps of the Property, and looked down onto the Property from a ridge above the Property.

Mr. Ivie testified that when Mr. Ivie was hired to conduct the appraisal, Mr. Ivie was not told what the purpose of the appraisal would be. Mr. Ivie also stated that Mr. Ivie would have turned down the assignment if anyone had given him a pre-determined value for the Property.

Relying on public records, Mr. Ivie stated that the Property has a gross living area of 7,781 square feet and sits on a 6.1 acre parcel in the hills of Milpitas. Mr. Ivie believed that the Property was completely finished, and stated that the Property was

surrounded by a fence. According to Mr. Ivie's appraisal, the Property was six years old at the time of the appraisal, has a view of the bay and city lights, and has a five-car garage.[1] Mr. Ivie's appraisal also stated that the Property has five bedrooms and four and a half bathrooms.[2]

In the appraisal, Mr. Ivie used a market data approach to value the Property. Using this approach, Mr. Ivie used similar and comparable properties to come to a value, making adjustments for distinguishing features such as lot size, quality, condition, number of bedrooms, number of bathrooms, gross living area (meaning the size of the residential structure), and location. However, Mr. Ivie did not make adjustments for age and explained that Mr. Ivie did not think an age adjustment was necessary after looking at statistics and the MLS, and because the age of the Property was similar to the age of the comparables. In this appraisal, Mr. Ivie assigned the Property a value of $2,750,000 as of November 21, 2013 -- approximately three months prior to the trial on the Debtors' motion.

Mr. Ivie compared the Debtors' Property with six other properties. In selecting the comparable properties, Mr. Ivie looked for properties sold within six to eight months prior to the inspection date of November 21, 2013, and up to five miles away

---

[1] By contrast, Mr. McElroy's appraisal stated that the Property has a six-car garage. The photographs included with Mr. McElroy's appraisal include a picture of four garage doors, two of which lead to double parking spaces, and two of which lead to single parking spaces. It thus appears that the Property has a six-car garage.

[2] Mr. McElroy's appraisal also stated at pages 1, 3, and 5 that the Property has 5.1 bathrooms. The "tenth" of a bathroom was not explained.

from the Property.  Mr. Ivie stated that Mr. Ivie looked for similar properties within that five-mile radius, but discovered that there were not a great deal of closed sales in the area. Therefore, Mr. Ivie expanded Mr. Ivie's search to include properties with different gross living areas.  After making this expansion, Mr. Ivie found only four properties initially, two of which were sold properties (comparables #2 and #3), and two of which were current listings (comparables #5 and #6).  When Mr. Ivie expanded the search to include a 24-month time frame, Mr. Ivie found between ten and twenty sales.  Of these, Mr. Ivie used two as comparables (comparables #1 and #4).

Of the comparables selected by Mr. Ivie, Mr. Ivie testified that three comparables (#1, #2, and #5) were 6,500 square feet or greater.  As a result, Mr. Ivie opined that the Property is not too large for the neighborhood and not "overbuilt."  However, Mr. Ivie acknowledged that there were no sales of properties in the area which were larger than, or equivalent in size to, the Property. Mr. Ivie also noted that there were very few homes in the area which were the size of the Property or larger, and possibly fewer than one percent of homes were as large as the Property.

Mr. Ivie did not make any adjustments for the Property's proximity to a fault line.  Mr. Ivie explained that there are many earthquake faults in the Bay Area, and unless proximity to a fault line is brought to Mr. Ivie's attention, or unless earthquake insurance is required, then Mr. Ivie does not consider whether there is an earthquake fault nearby.

Mr. Ivie also explained that Mr. Ivie's assessment of value takes into account the overall utility and overall condition of

each comparable in comparison to the Property. This entails looking at proximity to neighbors, the size of the lot, and topography. When looking at properties smaller than the Property, Mr. Ivie made positive adjustments for gross living area. Mr. Ivie also made positive adjustments for inferior properties, and negative adjustments for superior properties.

Mr. Ivie's comparable #1 is located at 1855 Saint Andrews Court in Milpitas, California, and is only 0.63 miles from the Property. Comparable #1 sold for a price of $2,730,000 and closed escrow on August 13, 2012. Comparable #1's parcel is only 0.4 acres, and for this reason, Mr. Ivie made a positive adjustment to the sale price of $50,000 per acre in the total amount of $285,000.[3] Mr. Ivie made no adjustments for comparable #1's view, which Mr. Ivie treated as similar to the Property's view. Because comparable #1 is only 6,745 square feet, Mr. Ivie made a positive adjustment of $130,000 to account for the comparable's smaller size. Mr. Ivie also made a positive adjustment of $10,000 because the Property has more bathrooms. Because the landscaping of comparable #1 was superior to the Property, Mr. Ivie made a negative adjustment of $100,000. With a net adjustment of positive $325,000, Mr. Ivie assigned comparable #1 an adjusted sale price of $3,055,000.

Comparable #2 is located at 1155 Saguare Common in Fremont, California, and is 3.63 miles from the Property. Comparable #2 sold for $2,034,00 and closed escrow on June 19, 2013. Using the $50,000 per acre adjustment, Mr. Ivie made a positive adjustment of

_____

[3] Mr. Ivie made this $50,000 per acre adjustment for each comparable with a smaller lot, regardless of topography.

$170,000 to account for comparable #2's lot size of only 2.7 acres. Mr. Ivie deemed the view from comparable #2 to be inferior to the Property's view, and made a positive adjustment of $102,000. Mr. Ivie also made a $50,000 positive adjustment for comparable #2's inferior condition. Because comparable #2 has more bathrooms than the Property, Mr. Ivie made a negative adjustment of $40,000, but also made a positive adjustment of $92,000 because the gross living area for comparable #2 was only 7,047 square feet, less than the square footage of the Property. Comparable #2 also received a $20,000 positive adjustment for having a smaller garage, but received a negative adjustment of $40,000 for its pool. The net adjustment was $354,000, resulting in an adjusted sale price of $2,388,000.

Comparable #3 is located at 3132 Monte Sereno Terrace in Fremont, California, and is 2.16 miles from the Property. Comparable #3 sold for $1,935,000 and closed escrow on May 31, 2013. For acreage of only 0.6, Mr. Ivie made a positive adjustment of $275,000, and for the comparable's inferior view, he made a positive adjustment of $97,000. Mr. Ivie deemed the quality and condition of comparable #3 to be inferior to the Property, and made positive adjustments of $100,000 for quality and $50,000 for condition. Comparable #3 has more bathrooms than the Property, and Mr. Ivie made a negative adjustment of $20,000, but he also made a positive adjustment of $323,000 because comparable #3 has only 5,200 square feet of gross living area. Mr. Ivie made a $60,000 positive adjustment because comparable #3 has only a two-car garage, but gave a negative adjustment of $100,000 for superior

landscaping.  In all, the net adjustment was $785,000, resulting in an adjusted sale price of $2,720,000 for comparable #3.

Comparable #4 is located at 3003 Woodside Terrace in Fremont, California, and is 2.26 miles from the Property.  Comparable #4 sold for $2,257,500 and closed escrow on July 25, 2012.  For its 0.8 acres, Mr. Ivie made a positive adjustment of $265,000, and also made positive adjustments of $113,000 for its inferior view, $100,000 for its inferior quality of construction, $50,000 for its inferior condition, $327,000 for its gross living area of 5,169 square feet, and $40,000 for its three-car garage.  Mr. Ivie made negative adjustments of $20,000 because comparable #4 had more bathrooms, $40,000 for its pool, and $100,000 for its superior landscaping.  The net adjustment was $735,000, resulting in an adjusted sale price of $2,992,500.

Comparable #5 is located at 664 Quince Lane in Milpitas, California, and is 0.45 miles from the Property.  Comparable #5 was listed for sale at an asking price of $2,788,000.  Mr. Ivie made positive adjustments to this price, as follows: $250,000 for its 1.1 acres; $50,000 for its inferior condition; and $153,000 for its gross living area of 6,554 square feet.  Mr. Ivie also made the following negative adjustments: $40,000 for the number of bathrooms; $20,000 for a six-car garage; $40,000 for a pool; and $100,000 for superior landscaping.  The net adjustment was $253,000, for an adjusted sale price of $3,041,000.

Comparable #6 is located at 3547 Vista Norte Court in Milpitas, California, and is 2.19 miles from the Property.  Comparable #6 was listed for sale at an asking price of $2,299,950.  For this comparable, Mr. Ivie made positive adjustments of $140,000

for its 3.3 acres, $50,000 for its inferior condition, $223,000 for
its 6,000 square feet of gross living area, and $40,000 for its
three-car garage. Mr. Ivie also made negative adjustments of
$20,000 for its additional bathroom, and $100,000 for its superior
landscaping. With a net adjustment of $333,000, Mr. Ivie assigned
comparable #6 an adjusted sale price of $2,632,950.

Regarding comparables #5 and #6, Mr. Ivie did not know whether
the current listings had sold after the appraisal was performed,
and explained that it is accepted practice to use current listings
when using a market data valuation approach. Mr. Ivie testified
that Mr. Ivie did not make negative adjustments to the current
listings in anticipation of any price drops -- meaning Mr. Ivie did
not assume that the current listings would sell below asking price
-- because Mr. Ivie lacked data to make a reasonable adjustment.
Mr. Ivie stated that if the asking prices for the current listings
had dropped, then this would affect Mr. Ivie's appraisal and would
reduce the adjusted sale prices of the current listings.

The following chart summarizes the calculations made by Mr.
Ivie in determining the adjusted sale price for each comparable:

| Comp. | Sale/List Price | Acreage | View | Condition & Quality | Rooms | Gross Living Area | Other | Adjusted Sale Price[4] |
|---|---|---|---|---|---|---|---|---|
| 1 | 2,730,000 | +285,000 | none | none | +10,000 | +130,000 | -100,000 | 3,055,000 |
| 2 | 2,034,000 | +170,000 | +102,000 | +50,000 | -40,000 | +92,000 | -20,000 | 2,388,000 |
| 3 | 1,935,000 | +275,000 | +97,000 | +150,000 | -20,000 | +323,000 | -40,000 | 2,720,000 |
| 4 | 2,257,500 | +265,000 | +113,000 | +150,000 | -20,000 | +327,000 | -100,000 | 2,992,500 |
| 5 | 2,788,000 | +250,000 | none | +50,000 | -40,000 | +153,000 | -160,000 | 3,041,000 |
| 6 | 2,299,950 | +140,000 | none | +50,000 | -20,000 | +223,000 | -60,000 | 2,632,950 |

---

[4] The average adjusted sale price of Mr. Ivie's comparables
was $2,804,908.

**B. Testimony and Appraisal of Patrick McElroy**

The Debtors retained Patrick McElroy to conduct an appraisal of the Property.  Mr. McElroy is a general certified real estate appraiser and real estate broker.  Mr. McElroy has been a licensed broker since 1978.  Although Mr. McElroy has conducted appraisals since 1978, the licensing mechanism for appraisers only came into existence in 1991.  Therefore, Mr. McElroy has been a licensed appraiser since 1991.  Mr. McElroy is both a residential and commercial appraiser.

Mr. McElroy conducted an appraisal on January 17, 2014, approximately one month prior to the trial.[5]  Exhibit B is a copy of Mr. McElroy's January 17, 2014 appraisal.  In appraising the Property, Mr. McElroy knew in advance that the appraisal would be used in the Debtors' bankruptcy case.  In his appraisal, Mr. McElroy assigned the Property a value of $2,050,000 value based on a market approach, which Mr. McElroy explained was more accurate than a cost approach.[6]

---

[5] Also in evidence, by agreement of the parties, are two additional appraisals conducted for the Debtors.  One is an appraisal by Mr. McElroy with an effective date of July 25, 2011, which assigned a value to the Property of $1,875,000.  The other is an appraisal by Kindra Donald of Silicon Valley Appraisal with an effective date of December 13, 2013, assigning the Property a value of $1,800,000.  Because the January 17, 2014 appraisal is more relevant given its closer proximity to any confirmation of a chapter 11 plan, and because there was no testimony about the substance of the two earlier appraisals, the Court gives no weight to the two earlier appraisals.

[6] On cross-examination, Mr. McElroy was asked about the assessed value of the Property, which according to county records was $2,200,000 in 2012. Mr. McElroy responded that the assessed value is based on construction cost, and that a homeowner can challenge that value with the County.

1   Unlike Mr. Ivie, Mr. McElroy examined both the interior and
2   exterior of the Property.  Mr. McElroy testified that Mr. McElroy
3   measured the Property and found that the Property was over 7,900
4   square feet[7] -- larger than the 7,781 square foot gross living area
5   used by Mr. Ivie, and larger than what is reflected in the County's
6   records.

7   Mr. McElroy testified that the appraisal of the Property was
8   hard to conduct because of the Property's size, very good quality,
9   and location in an earthquake zone.  Mr. McElroy also stated that
10  it was difficult to find comparable sales.  Mr. McElroy looked at
11  properties sold from the Evergreen neighborhood of southeastern San
12  Jose to the northern city of Hayward over a two-year period, yet
13  found no comparable as large as the Property.  Mr. McElroy
14  explained that in conducting an appraisal, it is preferred to
15  "bracket" the appraised property with larger and smaller
16  properties, but that Mr. McElroy was unable to "bracket" in this
17  case, because the largest homes were generally in the 5,000 to
18  6,000 square foot range and were smaller than the Property.  As a
19  consequence, Mr. McElroy determined that the Property was an
20  overimprovement for the area, meaning that the residential
21  structure was overly large and that the owners could not expect to
22  get full value out of it upon sale, much like with a swimming pool.

23  Mr. McElroy testified that the construction at the Property
24  had not been finalized, and that this would have a negative effect
25  on any prospective buyer.  Mr. McElroy stated that there was a need
26  to obtain or renew a final permit from the City before the work

27

28

[7] According to the written appraisal, Mr. McElroy actually measured the Property's living space as 7,952 square feet.

could be completed.  When asked what work remained unfinished, Mr. McElroy explained that some of the City's requirements were not satisfied, that there was a need for landscaping, and that the fencing needed to be replaced per the City.  Mr. McElroy posited that a lender might require the work to be completed before approving a loan for a prospective buyer.  For these problems, Mr. McElroy deducted $100,000 from the Property's value.[8]

Mr. McElroy described the Property's site.  Mr. McElroy stated that the Property sits on a steep hill and has a beautiful view of the bay.  There are retaining walls, concrete swells, and drainage out to the street.  The hill is covered with weeds and has very few trees.  In Mr. McElroy's opinion, it was a very expensive site to develop.

In his most recent appraisal, Mr. McElroy used three of the same comparables as Mr. Ivie.[9]  Mr. McElroy's oldest comparable was only eight months stale.  Mr. McElroy did not put much weight on the active listings, for which the asking prices had dropped, and made a 3% negative adjustment to the active listings to account for the uncertainty of the final sale price.

Like Mr. Ivie, Mr. McElroy used six comparables in Mr. McElroy's appraisal.  All of Mr. McElroy's comparables were in the

---

[8] This $100,000 adjustment was made as a negative adjustment to each comparable property with superior landscaping.  Mr. Ivie made the exact same adjustment for comparable properties with superior landscaping.

[9] Mr. McElroy testified that four of the comparables were the same.  However, a comparison of Mr. McElroy's January 17, 2014 appraisal and Mr. Ivie's November 21, 2013 appraisal shows that only three comparables were the same: 1155 Saguare Common in Fremont, California; 3132 Monte Sereno Terrace in Fremont, California; and 3547 Vista Norte Court in Milpitas, California.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

eastern foothills, all had bay views,[10] and all were in earthquake zones.  Mr. McElroy did not conduct any interior inspections of the comparables, and explained that Mr. McElroy very seldom sees the inside of a comparable.

Mr. McElroy's comparable #1 is located at 4960 Sierra Road in San Jose, California, and is 6.49 miles from the Property. Comparable #1 sold for $1,300,000 and closed escrow in November 2013.  Mr. McElroy made numerous adjustments to the sale price, including the following positive adjustments: $400,000 for an inferior location;[11] $100,000 for the inferior quality of construction; $40,000 for its age of 28 years; $100,000 for its condition; $20,000 for having one less bathroom; $289,300, for having a gross living area of only 5,059 square feet; $16,000 for a smaller garage; and $20,000 under the category "patio/deck/porch." Mr. McElroy also made these negative adjustments: $24,829 for its larger site of 7.27 acres; $122,000 for "functional utility;" and $120,000 for good landscaping and a barn.  With a net adjustment of $718,471, Mr. McElroy obtained an adjusted sale price of $2,018,471 for comparable #1.

The term "functional utility" was used by Mr. McElroy to account for what Mr. McElroy deemed to be the excessive -- or overbuilt -- gross living area of the Property.  Mr. McElroy explained that properties with a gross living area of more than 6,000 square feet were functionally obsolete and outside the norm

_____

[10] Mr. McElroy testified that all six comparables had bay views, but later testified that the fourth comparable had a hillside view for which Mr. McElroy made an adjustment.

[11] The appraisal did not explain why comparable #1's location was inferior, except to note that comparable #1 has only a one-lane access.

1  of the neighborhood.  However, Mr. McElroy only made a functional

2  utility adjustment for any comparable property smaller than 7,000

3  square feet.  In selecting a cut-off point for functional

4  obsolescence, Mr. McElroy looked at surrounding properties not for

5  sale and found only a few homes larger than 8,000 square feet.  Mr.

6  McElroy did not search the County's records on the MLS, although

7  Mr. McElroy admitted that he could have done such a search.[12]

8  Mr. McElroy's calculation of a $122,000 negative adjustment

9  for functional utility was derived from the cost to build the

10  additional square footage, which Mr. McElroy estimated to be

11  approximately $488,000 ($250 per square foot for the square footage

12  over 6,000 square feet).  Mr. McElroy took 25% of this cost and

13  converted it into the negative adjustment.

14  Comparable #2 is located at 4011 China Court in Hayward,

15  California, and is 17.28 miles from the Property.  Comparable #2

16  sold for $2,212,500 and closed escrow in July 2013.  Mr. McElroy

17  made the following negative adjustments for comparable #2: $200,000

18  for a superior location;[13] $122,000 for functional utility; and

19  $100,000 for good landscaping.  Mr. McElroy made the following

20  positive adjustments as well: $40,511 for a lot size of 4.27 acres;

21  $20,000 for having one less bathroom; $287,000 for a gross living

22

23  _____

24  [12] On cross-examination, Mr. McElroy was asked whether Mr.
McElroy was aware of a sale in November 2010 on Country Club Drive

25  of a 6 bedroom, 9.5 bath house which sold for approximately
$4,000,000.  Mr. McElroy was not aware of such a sale, but stated

26  that it would be hard to make adjustments or to use such a property
as a comparable given the differences between the properties, and

27  that any adjustment would be "super heavy" and "suspicious."
Neither appraiser used this unidentified property as a comparable.

28
[13] Mr. McElroy did not explain why the Hayward location was
superior, and the written appraisal is silent in this regard.

area of 5,082 square feet; and $24,000 for a three-car garage. The net adjustment was negative $50,489, with an adjusted sale price of $2,162,011.

Comparable #3 is located at 1155 Saguare Common in Fremont, California. It is the same property as Mr. Ivie's comparable #2. Mr. McElroy made different adjustments to comparable #3's value than did Mr. Ivie. Mr. McElroy made the following positive adjustments: $74,052 for the smaller lot size of 2.73 acres (compared with $170,000 added by Mr. Ivie); $50,000 for the quality of construction (for which Mr. Ivie made no adjustment); $20,000 for the 20-year age of the comparable (for which Mr. Ivie made no adjustment); $50,000 for the condition of the comparable (Mr. Ivie made the same adjustment); $90,500 for the gross living area of 7,047 square feet (Mr. Ivie made an adjustment of $92,000); and $16,000 for the smaller garage, at $8,000 per stall (for which Mr. Ivie adjusted $20,000, at $10,000 per stall). Mr. McElroy also made these negative adjustments: $100,000 for a superior location because Fremont is a superior city to Milpitas and Fremont generally has better schools[14] (no adjustment by Mr. Ivie); $50,000 for two extra bathrooms (Mr. Ivie's adjustment was $40,000);[15] $50,000 for a pool (Mr. Ivie's adjustment was $40,000); and $100,000 for good landscaping (Mr. Ivie made no adjustment). Mr. McElroy's net adjustment for comparable #3 was $552, for an

---

[14] Mr. McElroy conceded that Mr. McElroy did not look at specific schools when making this adjustment for the Fremont comparables.

[15] At trial, Mr. McElroy explained that the appraisal contained an error, in that there was only one extra bathroom at comparable #3, not two. Mr. McElroy stated that the adjustment should have been only $20,000, not $50,000.

1  adjusted sale price of $2,034,552[16] (compared with Mr. Ivie's

2  adjusted sale price of $2,388,000).  Mr. McElroy made no positive

3  adjustment for the view.

4      Unlike the other comparables, comparable #3 had a guest unit.

5  Mr. McElroy stated that Mr. McElroy gave a $50,000 value to the

6  guest unit after determining, based on the MLS, that the guest unit

7  has both a kitchen and bath.  Mr. McElroy did not know the size of

8  the guest unit and did not have the MLS information with him in

9  court.

10     Comparable #4 is located at 3132 Monte Sereno Terrace in

11  Fremont, California.  It is the same property as Mr. Ivie's

12  comparable #3.  Mr. McElroy explained that this comparable is

13  located in a hillside gated community, not a rural community like

14  the Property.  For this comparable, Mr. McElroy made the following

15  positive adjustments: $120,855 for the 25,312 square foot site

16  (compared with a $275,000 adjustment by Mr. Ivie); $50,000 for the

17  inferior view (for which Mr. Ivie made a $97,000 adjustment);

18  $50,000 for quality of construction (for which Mr. Ivie adjusted

19  $100,000); $10,000 for its 17-year age (no adjustment by Mr. Ivie);

20  $50,000 for its condition (same adjustment by Mr. Ivie); $275,200

21  for a gross living area of 5,200 square feet (for which Mr. Ivie

22  adjusted $323,000); and $24,000 for a three-car garage (Mr. Ivie

23  adjusted $60,000 for a two-car garage).  Mr. McElroy also made

24  these negative adjustments: $200,000 for a superior location of the

25  comparable (no adjustment by Mr. Ivie); $20,000 for an additional

26  bathroom (same adjustment by Mr. Ivie); $122,000 for functional

27

28

---

[16] If the error regarding the extra bathroom is considered, the adjusted sale price should have been $2,064,552.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  utility (no adjustment by Mr. Ivie); and $100,000 for good

2  landscaping (same adjustment by Mr. Ivie).  Mr. McElroy's net

3  adjustment was positive, in the amount of $138,055, for an adjusted

4  sale price of $2,073,055 (compared with $2,720,000 by Mr. Ivie).

5      Comparable #5 is located at 3547 Vista Norte Court in

6  Milpitas, California, and is the current property listing also

7  considered by Mr. Ivie as Mr. Ivie's comparable #6.  However, at

8  the time when Mr. McElroy analyzed this comparable, the asking

9  price had dropped by $100,000 to $2,199,950.  Because this was an

10  active listing, Mr. McElroy made a negative adjustment of $65,999.

11  Mr. McElroy also made negative adjustments of $122,000 for

12  functional utility, and $100,000 for good landscaping (Mr. Ivie

13  also made this $100,000 adjustment).  Mr. McElroy also made

14  positive adjustments, as follows: $60,766 for the 3.34 acre site

15  (for which Mr. Ivie adjusted $140,000); $10,000 for the 14-year age

16  (no adjustment by Mr. Ivie); $195,200 for the gross living area

17  (for which Mr. Ivie adjusted $223,000);[17] and $24,000 for a three-

18  car garage (Mr. Ivie adjusted $40,000).  Mr. McElroy did not make

19  the $20,000 negative adjustment which Mr. Ivie made for an

20  additional bathroom.  Mr. McElroy's net adjustment for this

21  comparable was $1,967, for an adjusted sale price of $2,201,917.

22      Comparable #6 is located at 514 Vista Spring Court in

23  Milpitas, California, and is located 2.52 miles from the Property.

24  The asking price for the comparable was $1,788,000 at the time of

25  the appraisal, and because it was an active listing, Mr. McElroy

26  made a negative adjustment of $53,640.  Mr. McElroy also made

27

28  [17] Mr. McElroy testified that despite the different values
assigned by each appraiser for gross living area, statistically,
the adjustments were very close, even if within a range of $50,000.

negative adjustments of $122,000 for functional utility, $50,000 for a pool, and $100,000 for good landscaping.  Positive adjustments were as follows: $101,495 for the lot size of 1.47 acres; $50,000 for the quality of construction; $10,000 for the 22-year age of the comparable; $50,000 for the comparable's condition; $327,100 for the gross living area of 4,681 square feet; $16,000 for a four-car garage; and $3,000 for one less fireplace.  The net adjustment was $231,955, for an adjusted sale price of $2,019,955.

A summary of Mr. McElroy's adjustments is depicted in the following table:

| Comp. | Sale/List Price | Location & Site | Condition & Quality | Age | Rooms | Gross Living Area | Other | Adjusted Sale Price[18] |
|-------|-----------------|-----------------|---------------------|-----|-------|-------------------|-------|-------------------------|
| 1 | 1,300,000 | +375,171 | +200,000 | +40,000 | +20,000 | +289,300 | -206,000 | 2,018,471 |
| 2 | 2,212,500 | -159,489 | none | none | +20,000 | +287,000 | -198,000 | 2,162,011 |
| 3 | 2,034,000 | -25,948 | +100,000 | +20,000 | -50,000 | +90,500 | -134,000 | 2,034,552 |
| 4 | 1,935,000 | -79,145 | +100,000 | +10,000 | -20,000 | +275,200 | -148,000 | 2,073,055 |
| 5 | 2,199,950 | +60,766 | none | +10,000 | none | +195,200 | -263,999 | 2,201,917 |
| 6 | 1,788,000 | +101,495 | +100,000 | +10,000 | none | +327,100 | -306,640 | 2,019,955 |

The two biggest differences between Mr. McElroy's and Mr. Ivie's appraisals were the following: (1) Mr. McElroy was of the opinion that the Property was overbuilt for the area, and Mr. Ivie disagreed; and (2) Mr. McElroy assigned a value of $22,000 per acre (50 cents per square foot) instead of the $50,000 per acre used by Mr. Ivie when adjusting the values of the comparables, all of which were located on smaller sites.  Mr. McElroy explained that Mr. McElroy's adjustment for parcel size was based on the lesser

---

[18] The average adjusted sale price was approximately $2,084,993.  Mr. McElroy did not explain why he selected a lower value of $2,050,000.

utility of the Property's parcel, which was on a sloped site. Mr. McElroy admitted, however, that as many as two acres of the Property's site were flat and usable, and that Mr. McElroy did not change the calculation to account for the usable portion. Also, Mr. McElroy acknowledged that a sloped property can protect views and offer some privacy.

In appraising the Property, Mr. McElroy overlooked a guest unit (or cabana) measuring approximately 400 square feet. This guest unit is separate from the main house, is heated, has a bathroom, but has no kitchen or other facilities. Using a cost approach, Mr. McElroy stated that the unit was worth approximately $20,000 to $30,000. This guest unit should have brought Mr. McElroy's appraised value of the Property to at least $2,080,000.

## II. Conclusions of Law

The Debtors' Motion is brought under 11 U.S.C. § 506(a)(1), which provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Initially, the Debtors bear the burden of overcoming any presumption that the value of the property stated in Creditor's

proof of claim is the correct value.  See <u>In re Postolica</u>, No.
10-51522-ASW, 2012 WL 1035900 *5 (Bankr. Mar. 27, 2012) (citing <u>In re Southmark Storage Associates Ltd. Partnership</u>, 130 B.R. 9, 10 (Bankr. D. Conn. 1991)); <u>see also</u> <u>In re Southern California Plastics, Inc.</u>, 165 F.3d 1243, 1247-48 (9th Cir. 1999) ("[T]he proof of claim is <u>prima</u> <u>facie</u> evidence of the validity of the claim.  Although the creditor bears the ultimate burden of persuasion, the debtor must come forward with evidence to rebut the presumption of validity.") (Internal citation omitted).  Once the Debtors meet this burden, it then becomes the Creditor's burden of persuasion to demonstrate the value of the collateral by a preponderance of the evidence.  <u>Id.</u>  Here, the Creditor's proof of claim does not provide a value for the property, so the presumption is easily overcome in this case.

The parties agree that the Property should be valued according to its fair market value.  This agreement is supported by Supreme Court and Ninth Circuit cases.  <u>See</u> <u>In re Associates Commercial Corp. v. Rash</u>, 520 U.S. 953, 960 (1997) (rejecting a foreclosure value standard in the context of a chapter 13 "cram down," and explaining that the value of the property was "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller.");[19] <u>In re Kim</u>, 130 F.3d 863 (9th Cir. 1997) (citing <u>Taffi v. United States (In re Taffi)</u>, 96 F.3d 1190 (9th Cir. 1996)).  Because this is a chapter 11 case, the controlling date for valuation purposes is as close to

---

[19] Although <u>Rash</u> was a Chapter 13 case, the Sixth Circuit Bankruptcy Appellate Panel in <u>In re Creekside Sr. Apartments, LP</u>, 477 B.R. 40, 55 (B.A.P. 6th Cir. 2012), observed that the valuation method in <u>Rash</u> is equally applicable to Chapter 11 cases.

confirmation as possible.  See In re Dheming, 2013 WL 1195652, *3
(Bankr. N.D. Cal. Mar. 22, 2013).

The Creditor has asserted that the value of the Property is at
least $2,750,000; the Debtors contend that the value of the
Property is only $2,050,000.  This Court must determine only
whether the value of the Property exceeds the senior lien of
$2,253,668.32; if so, then the Creditor's $25,350 lien should not
be extinguished, because the Creditor's lien will be secured, at
least in part, by the Property.

The first main point of disagreement between the parties is
whether the Property is overbuilt, meaning that the gross living
area is so large that the value should be discounted.  In this
regard, the Court is persuaded that the Property -- which is a
luxury home with at least 7,781 square feet of gross living area --
is unusually large for the neighborhood and also for the eastern
foothills in general.[20]  The fact that both appraisers encountered
so much difficulty in locating suitable comparable sales is also
supportive of the conclusion that the Property is, indeed,
overbuilt.  The Court therefore concludes that it was appropriate
for Mr. McElroy to make some adjustment for functional
obsolescence, and that Mr. Ivie should have made some adjustment,
as well.

However, the $122,000 adjustment used by Mr. McElroy was not
supported.  The Court can accept that a buyer might not be willing
to pay $100 per square foot of living space over and above 6,000

_____

[20] An aerial photograph of the Property and neighboring homes
was included with Mr. McElroy's appraisal.  Interestingly, this
photograph shows that the Property is one of several large custom
homes on large lots adorning the same rural hillside as the
Property.

square feet for an overbuilt residence. However, Mr. McElroy derived the $122,000 adjustment from what Mr. McElroy deemed to be the cost to build the square footage over 6,000 square feet. The adjustment was not tied to what a willing buyer would pay a willing seller for the additional square footage on a price per square foot basis. While the Court agrees that the seller of an overbuilt house could not expect to recoup the entire cost of building the excess square footage, Mr. McElroy did not explain why Mr. McElroy heavily discounted the excess living space.

If the Property's gross living area is, indeed, over 7,900 square feet, then the $122,000 adjustment equates to a reduction of approximately $63 per square foot, bringing the price per square foot to approximately $37 for each square foot over 6,000. This dramatic reduction was not well-explained and is excessively low for current market conditions. Mr. McElroy also did not explain, to the Court's satisfaction, how Mr. McElroy selected 6,000 square feet as the cut-off for overbuilt homes.

Although Mr. McElroy had difficulty finding comparables equal or greater in size to the Property, there were ample comparables with gross living areas of over 6,500 square feet. To the extent that the appraisers selected different comparables, the Court concludes that Mr. Ivie selected more suitable comparables in Mr. Ivie's analysis. Indeed, three of Mr. Ivie's comparables were over 6,500 square feet, including one which was larger than 7,000 square feet. By contrast, four of Mr. McElroy's comparables were closer to 5,000 square feet, while the other two comparables were 6,000 and 7,047 square feet.

The Court is not able to determine -- with specificity -- what the correct adjustment for functional utility ought to have been. While a $37 per square foot for square footage in excess of 6,000 square feet is palpably unreasonable, the Court would have found a price per square foot of $75 or higher to be more accurate and believable. If a price of $75 per square foot had been used for square footage over 6,000, then Mr. McElroy could have made negative adjustments of approximately $48,000, rather than $122,000. This would have brought Mr. McElroy's estimated value of the Property up by $74,000 from $2,050,000 to $2,124,000.

The Court also concludes that Mr. McElroy's use of a $22,000 per acre adjustment to account for differences in parcel sizes was unreasonably low, for several reasons. Mr. McElroy did not consider that the Property's site had at least two usable acres which were flat enough to develop. In his calculation, Mr. McElroy also disregarded the important positive aspects of having a sloped site, such as view preservation and privacy, including long-term privacy. Moreover, all of the comparables were hillside properties with views. The Court concludes that Mr. McElroy selected an artificially low adjustment and chose to err on the side of using a lower value.

The Court concludes that the $50,000 per acre adjustment used by Mr. Ivie was more appropriate under the circumstances. Applying such an adjustment to Mr. McElroy's adjusted sale prices -- and adding $30,000 for the guest house or cabana which Mr. McElroy neglected to include in the written appraisal -- leads to the following results for each of the six comparables:

| Comp. | Sale/List Price | Location & Site | Guest Unit | All Other | Adjusted Sale Price |
|-------|-----------------|-----------------|------------|-----------|---------------------|
| 1 | 1,300,000 | +343,000 | +30,000 | +343,300 | 2,016,300 |
| 2 | 2,212,500 | -107,000 | +30,000 | +109,000 | 2,244,500 |
| 3 | 2,034,000 | +70,000 | +30,000[21] | +26,500 | 2,160,500[22] |
| 4 | 1,935,000 | +77,450 | +30,000 | +217,200 | 2,259,650 |
| 5 | 2,199,950 | +139,500 | +30,000 | -58,799 | 2,310,651 |
| 6 | 1,788,000 | +233,000 | +30,000 | +130,460 | 2,181,460 |

The average of these six adjusted sale prices is $2,195,510 -- only $58,158.32 less than what is owed on the first deed of trust -- and does not take into account Mr. McElroy's inappropriate use of a $122,000 negative adjustment for functional utility, which could bring the value for each comparable (except comparable #3) upwards by an additional $74,000.

The two appraisers' selections of various adjustments -- within a range of reasonableness -- are also extremely important. Mr. McElroy acknowledged that the gross living area adjustments made by Mr. Ivie were statistically close and permissible. To account for differences in square footage, Mr. McElroy used a $100 per square foot adjustment, while Mr. Ivie used up to $125 per square foot. With the square footage differentials in this case, this could be as much as, or more than, a $50,000 difference, depending on the properties being compared. For instance, Mr. Ivie made a positive adjustment of $323,000 for the Monte Sereno Terrace

---

[21] Although comparable #3 had a guest house which Mr. McElroy considered, this adjustment is needed to account for the fact that Mr. McElroy overlooked the guest unit at the Property.

[22] This figure does not include the $30,000 positive adjustment which should be made for the mistake in the appraisal regarding an extra bathroom.

1    comparable, whereas Mr. McElroy only made a positive adjustment of

2    $275,200.

3        The adjustments Mr. McElroy made for location are somewhat

4    baffling.  Mr. McElroy made negative adjustments of $100,000 and

5    $200,000, respectively, for the two Fremont comparables on the

6    basis that these properties have superior locations and better

7    schools, but Mr. McElroy did not examine the particular schools

8    assigned to each house and did not explain why Mr. McElroy made

9    these specific adjustments, or why the adjustments were different

10   for the two Fremont properties.  Mr. McElroy also made a $200,000

11   negative adjustment for comparable #2, located in Hayward, as

12   having a superior location, which was never explained or supported.

13   The dollar amounts used for these negative adjustments appeared to

14   be somewhat arbitrary and without specific factual support.

15       The Court is not able to divine the exact value of the

16   Property based on the two appraisals.  Neither appraisal was a

17   model of perfection.  For instance, Mr. Ivie chose not to make age

18   adjustments for comparables that were as many as sixteen years

19   older than the six-year old Property.  However, Mr. Ivie's

20   remaining calculations were persuasive and within the realm of

21   reason.  In light of the evidence, the Court finds that the

22   Creditor met its burden of persuasion and proved that the

23   Property's value exceeds $2,253,668.32, which is the amount owed to

24   the Bank as the holder of the first deed of trust.  Therefore, the

25   Creditor's lien is secured, at least in part if not in full, and

26   the Debtors' motion is denied.

27       **IT IS SO ORDERED.**

28           *** End of Memorandum Decision and Order ***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

Court Service List

2  Victor Talosig De Leon
   Imelda Fajardo De Leon
3  1350 Country Club Drive
   Milpitas, CA 95035

4

5  Marc Voisenat
   Law Offices of Marc Voisenat
6  1330 Broadway #734
   Oakland, CA 94612

7

8  Dhaivat Shah
   David Siegel
9  Grellas Shah LLP
   20400 Stevens Creek Blvd. #280
10 Cupertino, CA 95014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28